

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| DAWN CALABRESE, | ) | No. ED108057 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Hon. Rebeca M. Navarro-McKelvey |
| KELLY DWYER, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 5, 2021 |

Kelly Dwyer appeals the trial court's Judgment of Partition, Child Custody and Child Support. This case arises out of a dispute between Dwyer and her former partner, Dawn Calabrese. Dwyer contends the trial court erred in (1) partitioning the proceeds of real estate by awarding each party an equal share, (2) ordering Dwyer to reimburse Calabrese for certain expenses relating to the real estate, (3) requiring Dwyer to pay all of the partition-related attorney fees, (4) not awarding Dwyer any non-partition-related attorney fees, and (5) ordering Dwyer to pay all of the guardian ad litem ("GAL") fees. The judgment is affirmed in part, reversed in part and remanded.

## Factual and Procedural Background

Dwyer and Calabrese began their relationship in 1998 and shortly thereafter began living together in Dwyer's home (the "Diamond Pointe property"), which she had purchased earlier that year. They soon consolidated their finances by opening joint checking and joint savings accounts. Calabrese testified that she deposited all of her paychecks, bonuses, tax refunds, and other funds

into a joint account. Dwyer likewise put all of her wages into the joint checking account with the exception of "$200.00 per paycheck per month" that she deposited into their joint savings account. Dwyer frequently transferred money between the joint accounts. The parties used the funds in the joint checking account to pay the mortgage, car payments, school loans, and other living expenses.

The parties had a commitment ceremony in 2008 and, three years later, Calabrese gave birth to two children whom Dwyer adopted. In 2011, Dwyer added Calabrese to the deed of the Diamond Pointe property, although Calabrese had been contributing to the mortgage since shortly after she had moved into the house.

Dwyer deposited stock disbursements into the joint savings account. According to Dwyer, the total amount she deposited was approximately $200,000 and she withdrew $50,000 to repay loans she used to make a reinvestment requirement with her employer. Calabrese testified she deposited money from school cost-of-living loans in the amount of approximately $110,000 into one of the joint accounts from 2002 through 2004.

The parties sold the Diamond Pointe property in 2013 and deposited the $36,000 in net proceeds into one of the joint accounts. Dwyer and Calabrese jointly purchased their new home (the "Prairie Lake property") in June 2013 and both parties were liable on the mortgage. The down payment and earnest money used for the purchase came from one of the joint accounts. They refinanced the Prairie Lake property in 2016 in order to obtain an interest-only loan, which required them to pay an additional $31,718.55 toward the property. Calabrese wrote the check for that amount out of the joint savings account. Dwyer testified that $70,777 was paid out of the joint accounts for various improvements to the Prairie Lake property, including widening the driveway and adding fencing, a deck and a treehouse.

2

The parties' relationship ended in October 2017, but they both lived in the house until the following summer. On February 1, 2018, Calabrese filed her Petition to Determine Child Custody and Support in which she requested joint legal and joint physical custody of the children. Dwyer filed a counter-petition seeking the same. Calabrese also filed a separate Petition for Partition of Real and Personal Property, and the trial court consolidated the actions. The trial court appointed a GAL at Dwyer's request and ordered her to make an initial payment of $500 to the GAL. The trial court later ordered each party to pay an additional $750 in GAL fees, subject to reallocation at trial.

On July 16, 2018, the trial court entered a consent order in which the parties agreed to sell the Prairie Lake property and stipulated that Calabrese would pay the mortgage beginning August 1, 2018. Dwyer moved out of the Prairie Lake property on July 31, 2018, while Calabrese remained living there. The parties sold the Prairie Lake property in February 2019 and agreed to place the proceeds of $79,569.01 into escrow for the trial court to partition.

At trial, both parties asked for joint legal and joint physical custody of the children. There was testimony about behavioral issues with one of the children, but neither party ever alleged abuse or neglect. In its judgment, the trial court ordered Dwyer to be responsible for all of the GAL fees, which required her to repay $750 to Calabrese and to pay an additional $2,210 to the GAL.

With regard to the partition of the $79,569.01 in proceeds from the sale of the Prairie Lake property, Calabrese asked the trial court for an equal division while Dwyer requested the full amount. Dwyer showed the trial court a spreadsheet "tracing" her deposits of funds into the joint accounts and purportedly showing the use of those funds to pay specific expenses. She claimed that although the funds paid as part of the refinancing and the money spent on improvements came from the joint accounts, the sources of those expenditures were her stock disbursements and her

3

deposits of "$200.00 per paycheck per month." Dwyer also asserted the down payment and earnest money used for the purchase of the Prairie Lake property came from her regular deposits out of her paycheck and "her portion" of the proceeds from the sale of the Diamond Pointe property. Additionally, Dwyer argued she should be credited for expenses that Calabrese failed to pay relating to the property, which reduced the equity to be divided between the parties.

The trial court awarded each party an equal share of the proceeds of the Prairie Lake property, noting that Dwyer failed to present business records affidavits to support her supposed tracing. The trial court found that "in recent years, [Calabrese's] contribution to the joint accounts by way of income has greatly exceeded [Dwyer's]." The trial court also noted that "[n]either party presented any evidence that different expenses were designated to come from one party's funds or the other."

Calabrese testified and presented documentation regarding expenses she had incurred in preparing the house to be sold, and the trial court ordered Dwyer to reimburse Calabrese $107.66 for half of those expenses.

The trial court also considered the parties' dispute as to the payment of property taxes for the Prairie Lake property. Calabrese paid half of the 2017 taxes out of her separate funds after the parties separated. Dwyer claimed that she too had paid her share out of her own separate funds, but also admitted that between April and October 2017 she had withdrawn a total of $22,400 from one of the parties' joint accounts without notifying Calabrese, who continued to deposit her paychecks into the account during that period. The trial court found that Dwyer had deposited that money into a separate account, which she used to pay her half of the 2017 property taxes. In light of these withdrawals, the trial court ordered Dwyer to pay Calabrese $3,112.69 representing half of the 2017 real estate taxes.

4

With regard to the 2018 property taxes for the Prairie Lake property, there was an unpaid balance due at closing in the amount of $4,724.07, which reduced the equity to be divided between the parties. Calabrese admitted that she had paid nothing toward that year's property taxes, but also claimed that Dwyer had not paid her full share. Also unpaid at the time of closing were the February 2019 mortgage payment and a utility bill in the amount of $93, both of which further reduced the equity. The trial court did not address in its judgment the reduction in equity caused by the unpaid taxes, the missed mortgage payment and the unpaid utility bill.

Calabrese testified that her attorney fees and expenses relating to the partition totaled $9,954.69. The trial court left the evidence open after trial to allow the parties to submit updated documentation of attorney fees. The trial court determined that at least 50 percent of the attorney fees and costs Calabrese incurred after she testified were related to the partition. The trial court concluded the total amount of partition-related attorney fees and costs was $15,612.54 and ordered Dwyer to pay the full amount. The trial court also ordered that Calabrese and Dwyer were each responsible for the remainder of their own attorney fees.

**Standard of Review**

The trial court's judgment "must be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Hale v. Hale*, 180 S.W.3d 85, 89 (Mo. App. E.D. 2005). "We accept as true the evidence and reasonable inferences therefrom in the light most favorable to the verdict, and disregard all contradictory evidence and inferences." *Id*. We defer to the trial court's "superior ability to judge factors such as credibility, sincerity, character of the witnesses, and other intangibles not revealed in the transcript." *Id*. "The trial court may accept or reject all, part, or none of the witnesses' testimony." *Id*.

**Discussion**

Division of Partition Proceeds

In her first point, Dwyer contends the trial court erred in awarding Calabrese 50 percent of the proceeds from the sale of the Prairie Lake property because the award is against the weight of the evidence. Specifically, Dwyer contends the trial court erred in not crediting her for: (1) the down payment and earnest money, (2) the funds paid to refinance the property, and (3) improvements made to the property. Dwyer also asserts the trial court failed to account for the fact that Calabrese did not pay certain expenses relating to the Prairie Lake property, which reduced the equity to be divided between the parties.

"Unless otherwise specified in a deed, it is presumed that co-tenants possess equal ownership shares in real property." *Turner v. Pence*, 514 S.W.3d 98, 103 (Mo. App. W.D. 2017).[1] Dwyer asserts she rebutted the presumption of equal ownership because she contributed unequally toward the Prairie Lake property. She claims that she was able to trace funds used for the Prairie Lake property back to her separate funds. She admitted, however, that all of these funds were

---

[1] The parties disagree as to the current state of the law on what a party must prove to rebut the presumption of equal ownership. Calabrese cites *Montgomery v. Roberts*, 714 S.W.2d 234, 236 (Mo. App. E.D. 1986), where this Court relied on a treatise to hold that the presumption may be rebutted by proof of unequal contributions "toward the purchase of the property and there is neither a family relationship among the co-tenants nor any evidence of donative intent on the part of those who contributed more than their pro rata amounts towards the purchase price." (quotation omitted). Dwyer relies on *Hoit v. Rankin*, 320 S.W.3d 761, 765-72 (Mo. App. W.D. 2010), where the Western District "explored the origin" of the above-quoted principle from *Montgomery* and determined it was an inaccurate statement of the law that resulted from the *Montgomery* court's reliance on the treatise, which the *Hoit* court concluded contained "unfortunate paraphrasing" of an Illinois case. (citing *People v. Varel*, 184 N.E. 209 (1932)). After conducting an in-depth analysis of the law on this issue, the *Hoit* court held that "[e]vidence relevant to rebut the presumption may include evidence that the co-tenants contributed unequally toward the purchase of the property." The court added that "unequal contributions may be explained by evidence that the co-tenant contributing a greater amount toward purchase intended the disparity as an enforceable gift, a determination which may be influenced by evidence of the nature of the relationship among the co-tenants." *Id*. at 772. Here, because we conclude that Dwyer failed to establish she made an unequal contribution to the property, we need not reach the issues of donative intent and the parties' family relationship.

6

deposited in the joint accounts she shared with Calabrese. Because the parties comingled their funds for nearly 20 years and all of the expenditures at issue were paid out of their joint accounts, we conclude the trial court's determination that each party should receive an equal share of the proceeds was not against the weight of the evidence.

With regard to the down payment and earnest money the parties paid toward the Prairie Lake property, Dwyer contends that money came from her separate assets—specifically, "her portion" of the profit from the Diamond Pointe property and her deposits of "$200.00 per paycheck per month" into the parties' joint savings account. Dwyer claims that nearly 84 percent of the profit from the Diamond Pointe property was "her portion of the sale proceeds." We conclude, however, that the down payment and earnest money came from the parties' joint assets.

As noted, Dwyer purchased the Diamond Pointe property in April 1998, and Calabrese moved into the residence later that year. Dwyer testified that she did not intend to make a gift to Calabrese when she added her to the deed of the Diamond Pointe property in 2011, but she did not testify as to how much money she put down toward the property when she purchased it in 1998 nor did she provide evidence as to how much equity she had in the property before the parties began paying the mortgage out of their joint accounts. From 1998 until the house was sold in 2013, the parties paid the mortgage and all household expenses out of joint accounts into which each party deposited funds. Then, after the parties sold the Diamond Pointe property, they deposited the proceeds into a joint account where they were comingled with the parties' other joint funds. Although Dwyer regularly deposited "$200.00 per month per paycheck" into the joint savings account, she admitted she frequently transferred money between the parties' joint accounts. The parties used joint funds for the down payment and earnest money for the purchase of the Prairie Lake property. Dwyer and Calabrese took title to that property as joint tenants and

7

were jointly liable on the mortgage and all expenses were paid from a joint account. Due to the long history of comingling by the parties, we cannot conclude the trial court erred in not crediting Dwyer for the down payment and earnest money when partitioning the proceeds.

Dwyer also claims that funds from her stock distributions and her deposits of "$200.00 per paycheck per month" were used to pay for the refinancing of the Prairie Lake property and for other improvements to the property. She admitted, however, that all of these funds were deposited into the joint accounts she shared with Calabrese. As noted, Dwyer showed the trial court a spreadsheet that she contended traced her deposits of funds from the sale of stock into a joint account and the use of those funds to pay specific expenses. But, as the trial court noted, she did not present any business records affidavits to support her supposed tracing. She also failed to take into account deposits Calabrese had made into the joint accounts. The only evidence supporting Dwyer's assertion that the funds came from her separate assets was her own testimony, which the trial court was free to disbelieve. *See Estate of Wilson*, 740 S.W.2d 694, 696 (Mo. App. E.D. 1987). "Evidence of each tenant's contribution is often unobtainable and cannot be reconstructed over time, under such a circumstance, any division other than even is unfair." *Id.* at 697. We conclude the trial court did not err in not crediting Dwyer with regard to the refinancing cost and the expenses for the various improvements.

Dwyer also claims the trial court erred in failing to account for the fact that Calabrese did not pay certain expenses relating to the Prairie Lake property, which reduced the equity in the property. "It is well settled that in a partition proceeding, the parties are entitled to reimbursement for expenditures with respect to the property for taxes, insurance and necessary repairs and improvements." *Clark v. Dady*, 131 S.W.3d 382, 390 (Mo. App. W.D. 2004).

8

Dwyer argues the trial court erred in not taking into account the reduction in equity that resulted from Calabrese's failure to pay the utility bill in the amount of $93. That claim fails, however, because Calabrese testified the utility bill was from February 2017, which was before Dwyer moved out of the house.

Dwyer also argues the trial court erred in not adjusting the parties' shares based on the reduction in equity caused by Calabrese's failure to pay the February 2019 mortgage payment. In her brief, Dwyer asserts the amount of that payment was $1,040. Although the record includes documentation of the mortgage payments Calabrese made from August 2018 through January 2019, the amounts of those payments varied, presumably because the loan had an adjustable interest rate. In any event, Dwyer never specified to the trial court the amount of the February 2019 payment and did not articulate how much the equity was reduced by Calabrese's failure to pay it. In contending the February 2019 payment was for $1,040, it appears Calabrese is assuming that payment was for the same amount as the January 2019 payment. But without evidence from Dwyer as to the actual amount of the February 2019 payment, the trial court could only have speculated as to how much the equity was reduced by Calabrese's failure to make that payment. We would also have to speculate, which we cannot do. *See Martha's Hands, LLC v. Rothman*, 328 S.W.3d 474, 481 (Mo. App. E.D. 2010). Accordingly, we cannot conclude the trial court erred in not crediting Dwyer as to the missed mortgage payment. *See Cooper v. Murphy*, 276 S.W.3d 380, 383-84 (Mo. App. E.D. 2009) (rejecting the appellant's claim that the trial court erred in not awarding him half of the expenses he incurred in maintaining and improving the property when much of the appellant's testimony "was general and did not include specific dollar amounts").

Dwyer also asserts the trial court erred in not taking into account the reduction in equity caused by Calabrese's failure to pay her share of the 2018 property taxes. According to Dwyer,

9

Calabrese was responsible for the entire unpaid portion of those taxes, but Calabrese testified that both parties owed unpaid taxes. Calabrese admitted that she paid nothing toward that year's taxes and acknowledged that she had sent Dwyer an email in which she expressed her intention to pay her half. But she also testified that Dwyer "did not pay full real estate taxes as well" and had only "paid a percentage" of them. When asked how much Dwyer had paid, Calabrese responded, "I would have to look it up specifically. It may have been seven-twelfths." Calabrese maintained that both parties were responsible for the unpaid taxes and stated that Dwyer "didn't pay her half…she paid seven-twelfths."

The ambiguous nature of the evidence on this subject was not helped by the fact that Dwyer herself did not testify about the 2018 property taxes at all. Dwyer now asserts in her brief, citing Calabrese's testimony, that she "paid 7/12 of the 2018 real property taxes . . . for the 7 months she resided at [the Prairie Lake property]." But in a proposed judgment she submitted to the trial court, Dwyer stated that she "paid [half] of the 2018 real property taxes . . . for the 7 months she resided at [the Prairie Lake property]."

A party in a partition action who seeks a credit out of the proceeds for expenses relating to the property must present specific evidence that would permit the trial court to determine the appropriate amount to credit that party without having to resort to speculation. *See id*. Rather than testifying herself as to how much the equity was reduced by Calabrese's failure to pay her share of the property taxes, Dwyer instead chose to rely on Calabrese's ambiguous testimony—even though that testimony was contrary to the position Dwyer now takes since Calabrese alleged Dwyer had also failed to pay her full share. We cannot fault the trial court for not crediting Dwyer with regard to the unpaid property taxes since Dwyer failed to provide the trial court with specific evidence to support such a credit. *See id*. Point I is denied.

10

<u>Reimbursement of Tax Payments and Repair Expenses</u>

In her next point, Dwyer argues the trial court erred in ordering her to reimburse Calabrese "for certain expenses related to [the Prairie Lake property] because this award is against the weight of the evidence in that the parties each paid [half] of the 2017 real estate taxes from separate accounts and the home repair expenses occurred before the parties' separation."

The trial court ordered Dwyer to repay Calabrese $3,112.69 relating to the 2017 property taxes. As noted, between April and October 2017, Dwyer withdrew $22,400 from a joint account without notifying Calabrese, who continued to deposit her paychecks into the account during that period. The trial court found that the money withdrawn by Dwyer was placed into a separate account and that Dwyer's half of the 2017 property tax bill was paid from that account. In light of these withdrawals, the court ordered Dwyer to repay Calabrese for half of the 2017 property taxes.

With regard to the repairs to the Prairie Lake property, the trial court required Dwyer to pay $107.66 to reimburse Calabrese for half of the costs of repairs she made to prepare the house to be sold. "Upon partition, advances for repairs made in good faith for the substantial benefit of all co-tenants, may be allowed." *Hartog v. Siegler*, 615 S.W.2d 632, 636 (Mo. App. E.D. 1981). Dwyer claims the trial court failed to follow the July 16, 2018 consent order in which the parties agreed that "Any money owed to [Calabrese] from 8/1/2018 to closing reserved for trial" in that the trial court considered receipts for repair costs Calabrese had incurred prior to August 1, 2018. Contrary to Dwyer's assertion, the consent order did not prevent the consideration of the repair costs; it reserved future expenses for trial, but did not state that Calabrese was waiving reimbursement for any past repair expenses incurred in preparing the house to be sold.

We cannot conclude the trial court erred in holding Dwyer responsible for the $3,112.69 relating to the 2017 property taxes and the $107.66 for half of the repair expenses. We note, however, that rather than entering a money judgment against Dwyer, the trial court should have instead offset these amounts against Dwyer's share of the partition proceeds. "Reimbursements are effectuated in the event of a partition sale by 'offsetting the reimbursable expenditures against the sale proceeds partitioned to the other party.'" *Hoit v. Rankin*, 320 S.W.3d 761, 774 (Mo. App. W.D. 2010) (quoting *Clark*, 131 S.W.3d at 390). "A trial court is not authorized, however, to enter an *in personam* money judgment for the reimbursements." *Id*. Here, Dwyer does not appeal on the basis that the trial court erred in entering an *in personam* judgment and instead simply argues the trial court should not have allowed the reimbursements at all. Because Dwyer does not challenge the method of reimbursement on appeal, we will not reverse the judgment on that basis. We raise this issue to emphasize to trial courts and future litigants the importance of following the proper method of reimbursement for expenditures in partition proceedings. Point II is denied.

Partition-Related Attorney Fees

In her third point, Dwyer asserts the trial court erred in ordering her to pay Calabrese's attorney $15,612.54 in fees relating to the partition action. We agree.

"The trial court's award of attorneys' fees is reviewed for an abuse of discretion." *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 430 (Mo. banc 2013). "The trial court is deemed an expert at fashioning an award of attorneys' fees and may do so at its discretion." *Id*. "To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id.* at 431.

Section 528.530 and Rule 96.30 both provide that the court "shall allow a reasonable fee to the attorney" instituting a partition action.[2] "Because both parties benefit from the work of the attorney who handles the partition case (i.e. both receive partition sale proceeds), the defendant 'should not be permitted to escape the common burden, and throw upon the plaintiff the whole of it.'" *Tadych v. Horner*, 336 S.W.3d 174, 180 (Mo. App. W.D. 2011) (quoting *Arthaud v. McFerrin*, 156 S.W.2d 641, 642 (Mo. 1941)). Therefore, courts permit the attorney who brought the partition action to be compensated "out of the common fund realized from the sale of the property." *Higgins v. Olson*, 991 S.W.2d 216, 219 (Mo. App. E.D. 1999). But because this compensation is "predicated on the theory that the attorney who instituted the partition action acts on behalf of both parties," it is generally "limited to 'such work as would be required in an uncontested suit.'" *Horner*, 336 S.W.3d at 180 (quoting *McFerrin*, 156 S.W.2d at 642); *see also Higgins*, 991 S.W.2d at 219 ("In a partition action, the award of fees must be limited to fees incurred representing both parties.").

Here, Calabrese testified that her "total partition-related attorney fees and expenses" as of two days before the trial totaled $9,954.69. The trial court concluded that at least 50 percent of the attorney fees and costs Calabrese incurred after she testified also related to the partition. Taking those fees and costs into account, the trial court concluded the total attorney fees and costs relating to the partition were $15,612.54 and ordered Dwyer to pay the entire amount.

We conclude the trial court abused its discretion in making its award of attorney fees and costs relating to the partition. First, the trial court's award was for the total amount of partition-related fees. This was a highly contested case and there is no indication the trial court limited the award to work that Calabrese's attorney performed for the benefit of both parties. Second, rather

---

[2] All statutory references are to RSMo (2016). All rule references are to the Missouri Supreme Court Rules (2019).

13

than ordering the fees to be taken out of the proceeds from the sale of the property currently held in escrow, the trial court ordered Dwyer to pay all of the partition-related fees separately. Because the permissible attorney fees relating to a partition can only arise from work done for the benefit of both parties, each party should ordinarily bear an equal burden with regard to those fees, which should be deducted from the partition proceeds before the trial court divides the remaining proceeds between the parties. *See id*; *see also Williams v. Williams*, 990 S.W.2d 665, 669 (Mo. App. E.D. 1999) (recognizing that attorney fees are to "be paid from the partition proceeds"). "An exception to this rule exists where the defendant is uncooperative and unduly litigious in his opposition to the partition action." *Tadych*, 336 S.W.3d at 180; *see also Hoeper v. Liley*, 527 S.W.3d 151, 158-59 (Mo. App. W.D. 2017) (holding that a trial court may award extraordinary fees when one party engages in egregious and vexatious behavior). That exception does not apply here because the trial court stated it was "not awarding any extraordinary fees as it did not find [Dwyer] acted in a manner which made the partition case more difficult or vexatious." But the trial court obviously did award extraordinary fees as it required Dwyer to pay 100 percent of the total attorney fees and costs relating to the partition.

Calabrese "should not be permitted to escape the common burden, and throw upon [Dwyer] the whole of it." *Arthaud*, 156 S.W.2d at 642. We reverse and remand to allow the trial court to make findings as to the amount of partition-related attorney fees and costs that resulted from work benefiting both parties. The trial court is directed to then order that amount to be paid to Calabrese's attorney out of the funds in escrow before dividing the remaining proceeds between the parties in accordance with this opinion. In her brief, Dwyer states that Calabrese's attorney has already garnished her wages and bank account to collect the fees. The trial court is directed to credit Dwyer for any amounts that have already been collected through those garnishments.

14

Non-Partition-Related Attorney Fees

In her fourth point, Dwyer contends the trial court erred in not awarding her any attorney fees. According to Dwyer, the trial court "failed to consider the financial resources of the parties; the merits of the case; or the actions of the parties during the proceedings."

"Parties in domestic relations cases generally are responsible for their own attorneys' fees." *Gilbert v. Koparan*, 588 S.W.3d 533, 542 (Mo. App. E.D. 2019). Section 452.355.1, however, allows a trial court to award reasonable attorney fees and costs to a party after considering all relevant factors, including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action. "As an expert on the necessity, reasonableness, and value of attorney's fees, the trial court may independently determine and award the fees it deems appropriate." *Serafin v. Serafin*, 493 S.W.3d 897, 902 (Mo. App. E.D. 2016). "An appellate court will reverse a trial court's award of attorney's fees pursuant to [section] 452.355.1 only if the trial court abuses its discretion." *Id.* at 903. "To demonstrate an abuse of discretion, the complaining party must prove that the award is clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Gilbert*, 588 S.W.3d at 542.

Here, although both parties requested the other party to pay some or all of their attorney fees, the trial court ordered Dwyer and Calabrese to each pay their own attorney fees aside from those relating to the partition. Dwyer argues the trial court erred in not awarding her fees because (1) Calabrese makes substantially more money than she does, (2) Calabrese prolonged the litigation by filing numerous motions that were denied, and (3) Calabrese's attorney fees were higher than hers. The mere fact "that one party's income exceeds the other's income does not compel an award of attorney's fees." *Serafin*, 493 S.W.3d at 902. With regard to Dwyer's claim

15

that Calabrese prolonged the litigation, the record shows that Calabrese's motions during the pendency of the case were often granted in part and denied in part or resolved by consent of the parties. And the fact that one party's attorney fees are higher than those of the other party is not a relevant consideration under section 452.355.1. The trial court did not find that either party made the proceeding more vexatious or difficult. Having weighed the relevant factors, the trial court determined Dwyer and Calabrese should each pay their own attorney fees and did not abuse its discretion in doing so.[3] Point IV is denied.

## GAL Fees

In her final point, Dwyer asserts the trial court abused its discretion in ordering her to pay all of the GAL fees. She contends the trial court should have required each party to pay an equal share of those fees.

We will not disturb a trial court's award of GAL fees absent an abuse of discretion. *Keel v. Keel*, 439 S.W.3d 866, 880 (Mo. App. E.D. 2014). In ordering GAL fees, the trial court may consider the circumstances that required the GAL's appointment. *Wuebbeling v. Clark*, 502 S.W.3d 676, 685 (Mo. App. E.D. 2016).

Dwyer alleges the trial court erred "because both parties and the GAL testified regarding the issues with [one of the children], co-parenting, visitation, etc. that required a GAL." Dwyer also stresses that she makes less money than Calabrese and has already paid more GAL fees than her. The trial court appointed the GAL at Dwyer's request. Throughout the pendency of the case—from the initial pleadings up until the trial—the parties agreed to joint legal and joint physical custody of the children. Calabrese testified that she did not believe the appointment of a GAL was necessary, and neither party ever alleged the children had been subjected to abuse or

---

[3] Dwyer's request for attorney fees on appeal is denied.

neglect. Viewing the record as a whole, we conclude the trial court did not abuse its discretion in requiring Dwyer to pay all of the GAL fees. Point V is denied.

## Conclusion

For the foregoing reasons, the judgment is reversed in part as to the award of partition-related attorney fees and costs and is remanded with directions that the trial court shall conduct a hearing to determine the amount of partition-related attorney fees and costs that benefited both parties and shall order that amount to be paid to Calabrese's attorney out of the funds in escrow minus any amounts that have already been collected by Calabrese's attorney through garnishments of Dwyer's bank accounts or wages. If any partition-related fees have been collected through garnishments, the trial court shall credit Dwyer in that amount. The trial court shall then divide the remaining proceeds between the parties in accordance with this opinion. The judgment is affirmed in all other respects.

_____
MICHAEL E. GARDNER, Judge

Gary M. Gaertner, Jr., P.J., concurs.
Philip M. Hess, J., concurs.